[No. 3667.]

*Ex Parte* W. C. Williams and others.

Habeas Corpus — Evidence.— See the statement of the case for evidence *held* sufficient to warrant the refusal of bail as to one but insufficient as to others accused of the same murder.

*Habeas Corpus* on appeal from a judgment refusing bail rendered by the Hon. George McCormick, judge of the twenty-fifth judicial

district, in and for the county of Wilson.   The applicants were held under *capiases* charging them with the murder of D. S. Overstreet.

M. M. Faust was the first witness for the applicants.   He testified that he was at the place of the killing.   He examined the wounds of the deceased, D. S. Overstreet, after his body had been removed to the house of Mr. Hurley.   He found one wound entering on the left side between the first and the second ribs.   This wound was evidently inflicted by a shot-gun.   The shot did not pass out of the body.   There were also two wounds near this shot-gun wound, made evidently by a forty-four calibre pistol or a Winchester rifle. The balls which inflicted these wounds passed entirely through the body of the deceased, making their exit nearly opposite the points of entry, or, to be exact, between the second and third ribs on the right side.   The three wounds, at the points of entrance, could have been covered by a circle three inches in diameter.   The exits of the two balls were four inches from the back-bone, and about an inch apart.   There was about the same distance between the points of entry of the balls.   Either one of the three wounds would have produced death.

These several wounds were certainly made by three several persons.   They were fired simultaneously as by word of command or preconcerted signal.   Such at least was the opinion of the witness based upon the fact that they entered the body near together, and passed out of the body together, or, in other words, there was about the same distance between the points of exit as between the points of entrance, and upon the further reason that, each wound being fatal, the first ball to strike would have so tilted the body as it fell as to change the course of the balls striking it last.   The body or wounds disclosed no powder-burns, but the parties who did the shooting did not stand more than ten or twelve feet distant from the deceased.   The wadding from the shot-gun was found in the clothing of the deceased.   Witness had had considerable experience with gun-shot wounds, and professed to be able to detect the points of entrance, and the course of balls, by an examination of wounds.

The place at which Overstreet, the deceased, was killed was at the mouth or corner of a lane between W. C. Williams's pasture and old man Hurley's field, around the corner of Hurley's field, on the right hand side of the lane.   There were three large oak trees within some ten or twelve feet of the road and about the same distance from the body of Overstreet.   The fence around Hurley's field was a close wood fence.   The oak trees mentioned were near Hurley's fence, to the right.   The fence around Williams's pasture

was a wire fence. Hurley's wood fence would have been good protection for those firing. It made a good barricade. Witness saw a puddle of blood in the road where the deceased fell. The course of the balls through the body was upwards, showing that the deceased was upon more elevated ground than his assassins, when shot.

Mrs. Overstreet, the widow of the deceased, was the next witness for the applicants. Just one week before the assassination of the deceased, the applicant W. C. Williams, Bennett McKenzie and several other parties came to the house occupied by the witness and the deceased, and called the deceased. Mr. Overstreet got up and went out to the door. Witness went to the window. Williams said to the deceased: "Overstreet, you must leave the country by next Thursday." Deceased replied that if he lived he would not leave the country, and would still be in it on Thursday, as he had done nothing for which to leave it. Williams replied: "You won't, you say?" Deceased replied again that he would still be in the country on Thursday, if he lived. The witness could not recognize the other members of the party, as they stood somewhat further removed from her, in the dark, on their horses. The manner in which Williams spoke to the deceased was peremptory and harsh, and was an order, and not a request that he should leave the country.

Just one week from the visit of these parties — on April 7, 1885 — the deceased was murdered. He was killed in Wilson county, on the morning of that day. The deceased, accompanied by his little daughter, eight years of age, started with a load of freight down the country. On that night he was brought back home under arrest by William Love, Oliver Love and W. T. Neal. Witness was asleep when the party reached the house, and was awakened by the deceased calling her. Witness went out to him, and he told witness that he had been arrested by the parties with him for waylaying Charley Hurley's house the night before; that he was absolutely innocent of the charge, as he could prove. He unharnessed his team, fed two of his horses, and brought the other horse near to the door, and called his little son to bring him his saddle, bridle and blanket. The boy being slow about obeying, the witness took the articles named to him. Deceased then asked the witness to get him some supper. William Love then spoke up and said: "We will not get supper here; we have not the time; we will get supper at my father's." Deceased then complained at his little boy for altering his stirrups, and said to witness: "You and the children come to Fair-

view to-morrow, as my trial will be held then and there." Deceased rented land from W. C. Williams, and was a tenant on his place. Trouble had arisen between Williams and the deceased, and Williams had been trying for some time to get deceased and his family off the place. The land had been rented for one year, and a crop had been planted and was growing. Williams had ill-feeling against the deceased, and had been abusing him.

J. S. Winters was the next witness for the applicants. He testified that about one week before the killing of Overstreet, W. C. Williams came to him and told him that a meeting would be held that night at a certain place, the object of which was to devise a plan of breaking up the practice of horse stealing prevalent among the Mexicans of the neighborhood, and to run them out of the country. Witness attended that meeting at the appointed time and place, and there met W. C. Williams, Charles Hurley, Sammons, Joe Timberlake, Youngblood, W. E. Love, Oliver Love, Jack Williams, James Williams and Granville Nicholson. When W. C. Williams invited the witness to attend this meeting, he told him to extend invitations to other parties. Soon after the parties named had assembled, Charles Hurley and W. C. Williams retired together, some little distance from the crowd, conferred together for some little time, returned to the crowd, and Hurley proposed that Overstreet be expelled from the country, as the first matter of business to be attended to. This proposition was seconded. Witness could not recollect whether the second was moved by Williams or not. To this proposition having in view the expulsion of Overstreet from the country, William Sammons, Granville Nicholson and Joe Timberlake refused to accede, remarking that they had no knowledge of any criminal acts on the part of Overstreet, and furthermore that they had no intention of joining a crusade against anybody to secure their expulsion from the country. The gentlemen named left the meeting, refusing to take further part in the deliberations. W. C. Williams then announced that another meeting would assemble at the same place on the next evening, and requested all the parties present to extend invitations to all good citizens, requesting them to attend.

The second meeting convened, in accordance with the adjournment, on the next evening and at the same place, with W. C. Williams, Charles Hurley, Jack Williams, James Williams, William Love, Oliver Love, Steve Youngblood and the witness in attendance. In accordance with the request of W. C. Williams, the witness invited E. T. Priest to attend the second meeting, but Priest, who

was an officer, refused to go, and the meeting was called to order with but eight or ten persons in attendance. The proposition to expel Overstreet from the country was the first matter brought forward. Nothing, however, in that direction was agreed upon, and the meeting adjourned.

Joe Timberlake was the next witness for the applicants. He testified that about one week prior to the killing of Overstreet, W. C. Williams, Charles Hurley, James and Jack Williams, W. W. Sammons, Steve Youngblood and witness met about dark, for the purpose, as the witness was led to understand, of devising means of putting down stock-stealing by Mexicans. That meeting was held near the Tullis place. W. C. Williams and Charles Hurley, addressing those present at the meeting, said that old man Overstreet ought to be compelled to leave the country. Witness objected to such a proceeding, and said that if Overstreet had violated the law, he should be left to be dealt with by the law. Sammons, acquiescing in this view, remarked that he did not think it right to run a man away from his home. At the close of this meeting, another meeting was arranged for the ensuing night. Witness did not attend that second meeting. Williams and Hurley, at the first meeting, proposed to secure the expulsion of Overstreet by waiting on him with notice to leave the country, and to force him to do so if he refused. William and Oliver Love were present at the first meeting. Witness lived in the same neighborhood with Overstreet, and had never heard of a criminal act being imputed to him.

E. T. Priest, the next witness for the applicants, testified that he was a justice of the peace. Charles Hurley came to the witness on the morning of April 7, 1885, and told him that he wanted to secure a writ for the arrest of D. S. Overstreet; that the said Overstreet, on the night before, near his, the said Hurley's, house, waylaid him, Hurley, and W. C. Williams. Witness issued the writ for the arrest of Overstreet, and went with Hurley to old man Love's, to get Love to execute the writ. At old man Love's house the witness found William Love, Oliver Love and W. T. Neal. Witness gave the writ to William Love to serve. While at Love's house, W. C. Williams and Bennett McKenzie came up, and McKenzie said: " You had better hurry up. Old man Overstreet left early this morning with a load of freight, and will get out of the county before you overtake him." William Love started with the writ, and Hurley asked him if he had any weapons with him; if not, he said that he had better take some one else with him. Witness next saw William Love, McKenzie and W. C. Williams in conversation between old man Love's

house and the store-room. Oliver Love and W. T. Neal accompanied William Love on his mission to arrest Overstreet.

William Love, Oliver Love and W. T. Neal came to the witness's house at about 10 o'clock on that night, and reported that, as they came out of the mouth of the lane between Williams's pasture and Hurley's field, some one shot and killed Overstreet; that some three or four shots were fired together; that Overstreet, at the time he was shot, was riding on the left hand side of William Love, and that the persons who killed him fired from ambush on the right hand side of the road, at the point where it turned the corner of Hurley's field. The Love boys appeared very much excited while detailing the circumstances of the assassination, but Neal did not appear in the least agitated. Witness then prepared to go to the body of Overstreet, and requested William and Oliver Love and W. T. Neal to go with him, but they declined, pleading fatigue. Witness assembled a jury of inquest and repaired to the body of Overstreet, which he found lying in the road at the mouth of the lane. Overstreet had been shot in three different places; in one place with a shot-gun, and in two places with pistols or Winchester rifles. These wounds were all within the radius of a circle three inches in diameter. Witness found two or three tracks near the place where the body lay. One of the tracks had the appearance of having been made by a man in falling, as the impressions made by the tacks or pegs in the heels were more distinct and more clearly marked than elsewhere in the track. The hole in the body made by the shot-gun was large enough to admit the insertion of three or four fingers of a man's hand. The two large balls passed entirely through the body. One of the balls was found in the undershirt of the deceased, on the side where it passed out. The balls passed out of the body about two inches apart and about four inches from the back-bone. They entered the body between the first and second ribs on the left hand side, and passed out between the second and third ribs on the right hand side. The ball found in the undershirt was of the size used with a forty-four calibre English bull-dog pistol.

The witness lived about a half a mile from the place of the assassination. He heard five or six reports of fire-arms just as he was making up his bed to retire. An hour later the Love boys and Neal arrived and reported the assassination of Overstreet. They said that they saw none of the parties who did the shooting; that when the shots were fired their horses became unmanageable; that William Love's horse sprang forward and ran; that Oliver's ran back down the road, and that Neal's ran into a wire fence. Wit-

ness examined the ground about the place of the killing on the next day. He found horse tracks very close to the wire fence at the mouth of the lane, around the corner of Hurley's field fence. Three large oak trees stood within ten or twelve feet from the road. The Love boys and Neal told witness that they did not know who did the shooting. It was not a moonlight night, but was such a night as the witness, at least, could have identified persons at a distance of fifteen or twenty feet. On the morning that the Love boys and Neal left old man Love's house to arrest Overstreet, Williams, McKenzie and Hurley stood where the witness last saw them for some little time, in conversation, and then rode off together. Witness saw no more of them on that day. When organizing the jury of inquest on the night of the assassination, witness had occasion to go to the house of old man Love, but he did not see the Love boys or Neal.

John Price was the next witness. He testified that he served as one of the jurors upon the inquest over the body of the deceased. He examined the body and found three wounds, one of which was, unquestionably, inflicted by a shot-gun; the other two by pistols or Winchester rifles. The pistol or rifle balls passed entirely through the body, entering on the right side and passing out on the left side, between the second and third ribs, four inches from the back-bone. Witness found one ball in the undershirt of the deceased. It was a large ball, of forty-four or forty-five calibre. Witness examined the tracks at the place of the killing the next day, in company with Charles Vandohland. They found three tracks. One of these tracks came into the road near its edge; one at a place the hogs had rooted, and one near the gap, close to the fence. Witness and his companion also found tracks near three oak trees which stood to the right of the road, some ten or twelve feet from where the body lay. The tracks at the trees had the appearance of having been made by persons in a sitting, squatting or kneeling position, as under each tree there was an impression each of a knee and a foot track of one person. The trees described were close to the corner of the fence, and persons under these could not be seen by any one coming up the lane. While witness and Vandohland were examining and commenting on the track at the edge of the road, Charles Hurley passed in between them and applied his foot to that track, and turned his foot so as to obliterate it. From the first track in the edge of the road, he, Hurley, stepped into the other tracks, obliterating all of them.

Solon Henderson testified that he was at the store of Henry Hud-

son, some three or four miles from the place of the killing, in the evening of the day on which the assassination occurred. That store was on the route which the *posse* in pursuit of Overstreet would have naturally returned. While witness was at that store Bennett McKenzie and Bud Tullis came up horseback, and asked Hudson if the Love boys and Neal had yet passed with old man Overstreet. Hudson replied that they had not as yet. About this time three Mexicans came up the road from the direction over which the parties with Overstreet were expected. McKenzie asked Hudson to ask the Mexicans if they saw anything of an old man and a little girl in a covered wagon, and three men on horseback who appeared to have the old man in custody. Hudson replied to McKenzie that the Mexicans had seen nothing of the parties, and that they had just come out of a pasture about a half mile below the store, where they had been at work with horses. McKenzie and Tullis rode down the road in the direction over which the Loves and Neal, in charge of Overstreet, were expected. Witness saw nothing more of McKenzie and Tullis, and on that night Overstreet was killed.

T. R. Cobb testified that he was at old man Love's house on the night of the killing, and heard six or seven shots, several of which were fired simultaneously. Shortly after the shooting the two Love boys and W. T. Neal came to the house and called for supper. They appeared very much excited, the Love boys particularly. The Love boys ate very little, but Neal ate very heartily. They spoke of the killing of Overstreet. Witness could not understand from them how Overstreet was killed until a little sister of the Love boys asked directly for particulars. They then said that Overstreet was killed by some parties they did not see or know, as they were conveying him along the road. During this conversation about the killing, one of the Love boys said that when Overstreet was shot, and as he fell, he said: "You have shot me." In speaking of this on the next morning, one of the Love boys said that the remark made by Overstreet as he fell was, "I am shot." They said that Overstreet was shot all to pieces. After they finished their suppers the Love boys and Neal left Love's house to go to Priest's and report the killing to him. Shortly after this assassination, the witness had a conversation with W. C. Williams upon the general subject of murder and the bad results of it. Witness in that conversation alluded specially to the murder of Overstreet as a particularly unfortunate occurrence for the community. Williams in reply said that it was worse for a man to deserve killing by actions such as those of which Overstreet had been guilty, than that the killing should be

done. He said: "I am sorry for the killing of Overstreet, but it was the best thing for the community that ever happened." He said further that he, Williams, did not know who perpetrated that killing, and he did not think it was the business of an honest man to investigate that question.

W. J. McIntyre testified that, on the day of the killing of Overstreet, Charles Hurley came to his store and purchased one or two small articles. He stood around for a short time, and then told the witness that he wanted a box of cartridges. As witness handed the cartridges to Hurley, Hurley remarked that officers had gone to arrest Overstreet, and requested witness to say nothing about his purchase of the cartridges, as he did not know what might happen, and that if it was known that he had bought the cartridges, an effort might be made to inculpate him in any wrong that might be done. The cartridges witness sold Hurley were for an English bull dog pistol of forty-four calibre. The difference between the cartridges for such pistols and those for Winchester rifles is that the rifle cartridge is the longer. The pistol cartridge is too short to fit the rifle.

Robert Tollett testified that he was present at a meeting of some citizens about a week before the night of the assassination. Hurley, the three Williamses mentioned by previous witnesses, Youngblood, Sammons and Timberlake were present. The object of that meeting, as the witness was informed, was to organize to protect stock interests from the depredations of Mexican horse thieves. Hurley at that meeting proposed by motion that Overstreet be expelled from the country. This motion was seconded, the witness believed, by W. C. Williams. When this resolution was brought forward, Nicholson, Timberlake and Sammons refused to co-operate longer with the parties present, and said that they attended the meeting with no such object in view as the expulsion of people from the county, and they left. Williams (W. C.) then announced that there would be another meeting at the same place on the next night, and that he hoped to see good men in attendance. Witness attended this second meeting, but Nicholson, Timberlake and Sammons did not. The proposition to run Overstreet off was revived at the second meeting. Witness did not go into this proposed scheme, and did not know what happened after that meeting broke up. He did not know that it was agreed at that meeting that Overstreet was to be expelled from the country.

J. M. Popham testified that the applicant Williams and Joe Sammons asked him to attend a meeting of citizens on the prairie near the place of E. G. Tullis, the object being, as stated to witness, to

organize for protection against the depredations of horse thieves. Several citizens, including W. C. Williams and C. C. Hurley, met at the appointed time and place. Williams and Hurley retired from the crowd for a short time, and when they returned Hurley moved that the parties there assembled proceed that night to Overstreet's and to Garcia's and run them out of the country, or rather to order them that night to leave the country. The motion contemplated a pledge that the parties present at the meeting would not divulge the proceedings had, upon the penalty of death. The majority of the meeting objected to this, when Hurley remarked: "This is a mixed crowd." Witness moved an adjournment until the succeeding night.

A few days after the assassination of Overstreet, W. C. Williams and C. C. Hurley sent the witness word by Steve Youngblood and Mark Tollett that if he told about the meeting his life would pay for it. Williams came in person to see the witness a few days later, and said to him: "Jim, I hear you have been talking about that meeting." Witness denied the imputation, when Williams replied that he wanted to hear no more about it, and that if witness told anything about the penalty provided by the resolution for disclosing the proceedings, it would be carried into effect. Williams then repeated to the witness the substance of the resolution. Witness did not know positively who seconded the resolution when it was proposed by Hurley, but thought the second was W. C. Williams.

Charles Vandohland testified substantially as did John Price, except that he said Hurley raked his foot across the track they were looking at and discussing, and turned and stepped into one of the other tracks. He was with Price when the examination of the tracks was made.

W. T. Neal's testimony, as reduced to writing on the examining trial, reads as follows:

"I am one of the guards who had D. S. Overstreet in charge under arrest when he was killed. William Love and Oliver Love were the others. Overstreet is now dead. He was killed on April 7, 1885. We overtook Overstreet while he was nooning about one mile on this side of the gate on this side of Humphrey's ranch. We arrested Overstreet, and, carrying him back to the office of the justice who ordered his arrest, we met, near the Pecosa, three men whom I did not know, but supposed to be Mexicans. We went on to Overstreet's house, where Overstreet unharnessed his team, fed two of his horses, and led the one that he was to ride to the gate, and there called his son Jimmy to bring his saddle. Mrs. Over-

street, the wife of the deceased, brought the saddle to the gate. While he was putting his saddle on his horse, he directed Mrs. Overstreet what to do on the morrow, and told her that he was going to be tried at Fairview; that he could prove himself innocent, and would make it hot for the parties; that she and the children should come up to the trial on the next day. He also said to his boy: 'You are always fooling with my saddle, and altering my stirrups,' and then let out his stirrup leathers. About this time he called to his wife for supper, but William Love said that we would get supper at his father's. We started towards Love's house, William Love and Overstreet in the lead, and myself and Oliver Love behind. I filled my pipe with tobacco. William gave me a match near the corner of Lum Williams's field, and I lighted it. In the lane we rode in the same position until we got to the south end of the lane at the corner of Hurley's field. Just as William Love and Overstreet turned the corner of the field, or just after, five or six shots were fired. Mine and Oliver's horses were frightened, mine running into the wire fence on the left hand side of the road. The shooting was from the right hand side. I saw the flash of guns, but, as my horse turned so quickly, I saw no one at the time. After the shooting ceased, I rode out ahead of Oliver, I think. He joined me, but my horse being frightened, ran back again, leaving me behind. About this time I saw some person near the corner of the fence. I checked my horse a little as the person approached me. He spoke and I knew his voice. He said: 'Bill Bennett and Charley and I have killed this man, and do you hold this forever.' The man who said this to me was Lum (W. C.) Williams, the defendant in court, whom I now identify. I left him going off in a gallop. He had something like a pistol in his hand. I judged it to be a pistol. It was not a gun. When I overtook the Love boys I asked them if they had seen anything, and they said they had not. I then said: 'We are in to it, for we can't prove we didn't do the shooting.' I did not tell the Love boys what I had seen or heard. We went on to old man Love's, ate supper, related the facts and went to Priest's, the justice of the peace, and told him of the transaction. The next day I saw Lum Williams at Charley Hurley's house. Lum, Charley and myself went from there to the house of Charley's father. Williams, the defendant, gave me a drink of whisky out of his flask, saying: 'That will assist you to steady your nerves,' and asking me if the Love boys knew the circumstances of the killing. He said: 'Do you think the Love boys know what you do?' I said: 'No, they told me that they did not

see anything.' He then said: 'I am not afraid to trust you, but I am afraid to trust them.' I again said I did not think they had seen anything. I then said: 'I will keep my part of it.'"

Cross-examined: "I am the W. T. Neal arrested for the same offense as the other defendants. I was at the coroner's inquest, and did swear there that I did not see anybody at the killing. I was afraid to swear otherwise. I knew what I stated was untrue, but I did it through fear. I am put on the stand now as a State's witness, with the understanding that the prosecution against me will be dismissed. I remember conversing with Burges, and telling him that when it was proposed to me to turn State's evidence that I had answered that I knew nothing; also that I could not testify against the other defendants, because I would not tell a lie to save my life, and if I told anything against them it would be a lie, for I knew nothing. I did tell Burges that I had no idea of turning State's evidence. I remember hearing Williams pleading his innocence several times. Lum Williams did tell me, in the presence of Burges and A. J. Williams, W. C. Williams (?) and the other defendants that he was perfectly willing that any one should tell all that he knew about his connection with the killing. After that I said that if I told anything against any of the defendants I would tell a lie. When I said this I was fixing to defend the case — that was the the cause of my saying it. Since then I have agreed to turn State's evidence, my object being to save myself and other innocent men. Any one charged as I am would be glad to get clear. I recognized Williams's voice when he came to me on the night of the killing. I do not know that I would have recognized his face at first if he had not spoken. He came close to me and put his hand on my horse's neck. Overstreet said something when he was shot, but I don't know what it was."

Redirect examination: "I sent for Mr. Spooner, having received a message from him. I did not voluntarily turn State's evidence until I was approached by him. When Williams spoke to me on the night of the killing, he was not more than twenty or thirty steps from the body of Overstreet, and it was before he, Williams, had left the scene. There are three trees on the right hand side of the road near the corner where the shooting took place. All the conversations I had with Burges, the defendants's attorney, took place before I received the message from Spooner. I don't think I ever told Burges that Spooner had said my attorney might listen to any proposition he made me, or that Burges said: 'That shows Spooner's fairness.'"

It was admitted that W. C. Williams could give bail in the sum of $6,000, and the two Loves in the sum of $2,000 each.

No brief for appellants.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. As to the appellant W. C. Williams, we find no error in the judgment of the court.

As to the appellants W. E. Love and Oliver Love, we are of the opinion that the evidence is not sufficient to justify the judgment refusing them bail. As to them we reverse the judgment and grant them bail in the sum of $2,000 each; and upon their giving good and sufficient bail in said amounts, in the manner and form required by law, the sheriff of Wilson county, Texas, or other officer having them in custody, will release them.

*Ordered accordingly.*

[Opinion delivered June 27, 1885.]